**UNITED STATES of America, Plaintiff–Appellee and Cross–Appellant,**

**v.**

**Daniel SANTISTEVAN, Defendant–Appellant and Cross–Appellee.**

Nos. 93–4179, 93–4196.

United States Court of Appeals, Tenth Circuit.

Oct. 31, 1994.

David J. Schwendiman (Scott M. Matheson, Jr., U.S. Atty., with him on the brief), First Asst. U.S. Atty., Salt Lake City, UT, for plaintiff-appellee and cross-appellant.

Joseph C. Fratto, Jr., Salt Lake City, UT, for defendant-appellant and cross-appellee.

Before ANDERSON, McKAY and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Daniel Santistevan was charged in an eight count redacted superseding indictment with distribution of cocaine and marijuana in violation of 21 U.S.C. § 841(a)(1). After a jury trial, he was convicted on seven of those eight counts. The district court, however, granted Mr. Santistevan's post-trial motion for judgment of acquittal on three of the seven counts. He was thereafter sentenced to a term of seventy-eight months incarceration and five years of supervised release.

The single issue presented in his appeal is whether the district court erred in denying his request for a base offense level reduction pursuant to U.S.S.G. § 3B1.2 because he was either a minimal or a minor participant. Case No. 93–4179. The United States cross-appealed, alleging the district court erred in granting the post-trial motion for judgment of acquittal with respect to two of the three counts.[1] Case No. 93–4196. We have jurisdiction over Mr. Santistevan's appeal pursuant 28 U.S.C. § 1291, and our jurisdiction over the United States' cross-appeal lies under 18 U.S.C. § 3731[2] and 28 U.S.C. § 1291. We affirm the district court's denial of the request for a base offense level reduction, and while we affirm the district court's order dismissing counts one and two, we do so for reasons other than those given by the district court.

## BACKGROUND

On July 8, 1992, a federal grand jury for the District of Utah indicted Daniel Santistevan and four other individuals on nineteen drug-related counts, including distribution of cocaine and marijuana in violation of 21 U.S.C. § 841(a)(1). Seven of those nineteen counts implicated Mr. Santistevan. Three of Mr. Santistevan's co-defendants subsequently pled guilty, and the case against the fourth individual was dismissed on motion of the government. On March 18, 1993, Mr. Santistevan was charged in a superseding indict-

---

1. Although the government's notice of appeal sought review of all three counts dismissed by the district court, it only argued on appeal that the district court erred with respect to two of those three counts.

2. In *United States v. Quarry*, 576 F.2d 830 (10th Cir.1978), we held § 3731 permits the United States to appeal an order granting a motion for judgment of acquittal without offending the dou-

ble jeopardy clause when the order is based on an interpretation of law. *Id.* at 832–33; *see also United States v. Allison*, 555 F.2d 1385, 1386–87 (7th Cir.1977) (because a judgment of acquittal after a jury verdict of guilty "would not require a retrial or any further proceeding," as opposed to a judgment of acquittal rendered because of a mistrial, § 3731 does not offend the double jeopardy clause).

ment with an eighth count of distribution of cocaine in violation of § 841(a)(1).[3]

The eight counts in the redacted superseding indictment alleged that between November 1989 and May 1992, Mr. Santistevan distributed controlled substances to Frank Mares (counts one through seven) and David Gallegos (count eight). Counts one and two are of particular importance as they form the basis for the United States' cross-appeal. The government's theory as to counts one and two[4] was that in November 1989, and then again in December 1989, Mr. Santistevan, with the assistance of his girlfriend Edith Bridgeforth, contacted Mr. Mares, a drug dealer, to see if he was interested in purchasing cocaine from the defendant. The government further alleged Mr. Mares agreed, for monetary compensation, to assist Mr. Santistevan in executing two "fake buys." These fake buys were intended by Mr. Santistevan as a means of regaining the trust of Manuel Medina, a known drug dealer, whom the defendant had worked with in the past and who allegedly supplied Mr. Santistevan with the cocaine to be sold. Mr. Santistevan had lost the trust of Mr. Medina because an earlier drug deal he was involved in had gone "sour," and he wanted to regain Mr. Medina's confidence by showing him he was capable of "turn[ing] it over." The crux of the scheme was the defendant would provide Mr. Mares with money to "purchase" cocaine from the defendant. After the "deals" were completed, however, Mr. Santistevan would get both the cocaine and the money back. As indicated, these "fake buys" were designed to impress Mr. Medina, although the record is unclear as to how exactly this goal was to be accomplished.

Counts three, six and seven charged Mr. Santistevan with "real" drug transactions with Mr. Mares, all of which took place at Ms. Bridgeforth's apartment in Salt Lake City on December 20, 1989, February 9, 1990, and February 25, 1990, respectively. Counts four and five involved an incident where Ms. Bridgeforth observed packages, which Mr. Santistevan represented to be co-

caine and marijuana, being transported to another location to facilitate a distribution. Finally, count eight involved an alleged sale of cocaine from Mr. Santistevan to Mr. Gallegos in May 1992.

A three-day jury trial commenced on May 26, 1993. At the close of the government's case-in-chief, the district court granted the defendant's motion for judgment of acquittal, and dismissed count four of the indictment due to insufficient evidence. The district court denied the motion with respect to counts one, two and five, and the defendant was thereafter convicted on the seven remaining counts. On a post-trial motion for judgment of acquittal, however, the district court granted the motion as to counts one, two and five. The ruling as to count five is not at issue. With respect to counts one and two, the district court concluded those two transactions were "mock" transactions undertaken without a "bad purpose," and therefore did not constitute a "distribution" of a controlled substance under § 841(a)(1).

## DISCUSSION

### I. Defendant's Appeal

Mr. Santistevan argues the district court erred in denying his request for a base offense level reduction under § 3B1.2 of the Guidelines on the ground he was either a minimal or a minor participant.

"A trial court's findings concerning a defendant's role in a particular offense are treated by an appellate court as factual findings, which are subject to deferential review under the clearly erroneous standard." *United States v. Chavez–Palacios*, 30 F.3d 1290, 1295 (10th Cir.1994) (citing *United States v. Phelps*, 17 F.3d 1334, 1337 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994); *United States v. Garcia*, 987 F.2d 1459, 1461 (10th Cir.1993)). We will not disturb a district court's finding of fact unless it is " 'without factual support in the record, or if after reviewing the evi-

---

**3.** Because Mr. Santistevan was the only defendant to be tried, the United States redacted the superseding indictment to list only the eight counts pertaining to him.

**4.** The briefs and the record are not entirely clear as to the precise theory relied on by the government with respect to counts one and two.

dence we are left with the definite and firm conviction that a mistake has been made.' " *Phelps,* 17 F.3d at 1337 (quoting *United States v. Beaulieu,* 893 F.2d 1177, 1182 (10th Cir.), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990)); *accord United States v. Telman,* 28 F.3d 94, 97 (10th Cir. 1994). It is the defendant's burden to establish, by a preponderance of the evidence, his entitlement to an offense level reduction under § 3B1.2. *See Telman,* 28 F.3d at 97 (citing *United States v. Occhipinti,* 998 F.2d 791, 802 (10th Cir.1993)); *United States v. Pedraza,* 27 F.3d 1515, 1530 (10th Cir.1994) (citing *United States v. Maldonado–Campos,* 920 F.2d 714, 717 (10th Cir.1990)), *cert. denied,* —— U.S. ——, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994).

▮ Section 3B1.2 vests the district court with discretion to grant a base offense level reduction if it finds a defendant is less culpable relative to other participants in a given offense. *See United States v. Rangel–Arreola,* 991 F.2d 1519, 1524 (10th Cir.1993) (citing *United States v. Arredondo–Santos,* 911 F.2d 424, 426 (10th Cir.1990)). The commentary to the Guidelines, which is authoritative unless it conflicts with federal law, *see Chavez–Palacios,* 30 F.3d at 1295 (citing *Stinson v. United States,* —— U.S. ——, —— ——, 113 S.Ct. 1913, 1918–19, 123 L.Ed.2d 598 (1993)), states the four-level decrease for "minimal" participation "will be used infrequently" and should be reserved for "defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, comment. (nn. 1–2). The two-level decrease for "minor" participation applies to individuals who are "less culpable than most other participants, but whose role could not be described as minimal." *Id.* (n. 3). Finally, the Guidelines permit a three-level decrease for an individual whose culpability is somewhere between that of either a minimal or a minor participant.

▮ While § 3B1.2 vests a district court with discretion to grant a base offense level reduction, § 3B1.1 permits the district court to grant a base offense level increase from two to four levels if it finds by a preponderance of the evidence a defendant was an organizer, leader, manager or supervisor in a given offense. *See* U.S.S.G. § 3B1.1; *Pedraza,* 27 F.3d at 1530 (discussing § 3B1.1).

In the present case, the government requested a base offense level increase while the defendant requested a base offense level decrease. The district court declined both requests, concluding the evidence did not warrant an adjustment either way. In *United States v. Garcia,* 987 F.2d 1459 (10th Cir.1993), we upheld the sentencing court's refusal to grant a base offense level increase or a decrease where the defendant was " 'simply in the middle with a lot of other people.' " *Id.* at 1461 (quoting the record). The trial court made a similar finding in this case and we find no error.

▮ Mr. Santistevan's conduct involved multiple distributions of controlled substances to Mr. Mares and Mr. Gallegos, a factor weighing against an offense level reduction under § 3B1.2. *See United States v. Montoya,* 24 F.3d 1248, 1249 (10th Cir.1994) (finding defendant's involvement in "more than" a single drug transaction placed her beyond the scope of § 3B1.2). Moreover, even if we accepted Mr. Santistevan's argument that he was only a "middle man" who simply facilitated drug sales from Medina to third parties, our precedents uniformly reject the argument that this fact alone compels the district court to exercise its discretion and grant a base offense level reduction under § 3B1.2. *See Rangel–Arreola,* 991 F.2d at 1524 (citing *United States v. Calderon–Porras,* 911 F.2d 421, 422 (10th Cir.1990)); *see also Montoya,* 24 F.3d at 1249 (collecting Tenth Circuit cases); *Garcia,* 987 F.2d at 1461 (rejecting defendant's argument that a base offense level reduction was warranted because he was a "go-between."). Under these circumstances, we find the district court's conclusion to deny the defendant's request for a base offense level reduction[5] to be supported by the evidence and not clearly

5. The government has not cross-appealed the district court's decision denying its request for a base offense level increase under § 3B1.1. Accordingly, we express no opinion on that ruling as it is not properly before us.

erroneous. *See United States v. Williams,* 923 F.2d 1397, 1404 (10th Cir.1990), *cert. denied,* 500 U.S. 925, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991).

## II. United States' Cross–Appeal

The United States' cross-appeal asserts the district court's decision to grant a judgment of acquittal on counts one and two because they were "mock" transactions, claiming the district court erred in its interpretation of § 841(a)(1).

 "A district court decision 'setting aside a jury verdict of guilt is entitled to no deference'" on appeal, *United States v. Reicher,* 983 F.2d 168, 170. (10th Cir.1992) (citation omitted), and we review that determination *de novo. See United States v. Coleman,* 9 F.3d 1480, 1482 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1234, 127 L.Ed.2d 578 (1994). We must therefore view the direct evidence, along with all reasonable inferences to be drawn from that evidence, in the light most favorable to the government to determine if a rational finder of fact could reasonably have found Mr. Santistevan guilty beyond a reasonable doubt. *See Chavez–Palacios,* 30 F.3d at 1293–94 (citing, *inter alia, Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979)).[6]

The district court granted Mr. Santistevan's motion as to counts one and two due to what it termed the lack of any "concrete involvement in the distribution of drugs." While we disagree with the district court's reliance on the "concrete involvement" language, we nonetheless agree with its ultimate conclusion that counts one and two must be dismissed because of a deficiency in the government's proof of an essential element of the crimes charged.

## A.

 Pursuant to the plain language of § 841(a)(1), the essential elements of a *prima facie* case of distribution of a controlled substance are: (1) knowing or intentional; (2) distribution; (3) of a controlled substance. In light of the unambiguous language in this statute, we have difficulty with the use of the amorphous term "concrete involvement" in defining what constitutes a "distribution."

 As we noted in *United States v. Wigley,* 627 F.2d 224, 226 (10th Cir.1980) (*per curiam* ), Congress specifically defined the term "distribution" in the Controlled Substances Act, 21 U.S.C. § 801 et seq., as a "delivery." 21 U.S.C. § 802(11). "Delivery" is further defined as "the actual, constructive, or attempted transfer of a controlled substance." 21 U.S.C. § 802(8). Given the clarity and specificity of Congress' definition of the term "distribution," we find the "concrete involvement" gloss to be both unnecessary and unwarranted.[7]

---

6. It is arguable that the issue presented in the cross-appeal is more appropriately viewed as a question of statutory interpretation of the distribution element of § 841(a)(1) rather than as a question of the sufficiency of the evidence. This issue is largely academic, however, because our review would still be plenary. *See Phelps,* 17 F.3d at 1337 (reviewing a district court's interpretation of a statute *de novo* ).

7. The plain language of the statute is sufficient in and of itself to discard the use of the "concrete involvement" language. Nonetheless, we find additional reasons to support our view that this language is, as the government acknowledges, "unfortunate and unnecessary."

This gloss apparently has its genesis in a pattern federal jury instruction, *see* Leonard B. Sand et al., Modern Federal Jury Instructions, Vol. 2, ¶ 56.01 at 56–24 (1993); however, the cases cited in that compilation do not appear to support the use of this language. Thus, the underpinnings of this language are questionable.

Moreover, another commonly used pattern federal jury instruction compilation does not contain this language, and instead, restricts the definition of the term "distribution" to the statutory definition given to it by Congress in § 802(8) and § 802(11). *See* Edward J. Devitt et al., Federal Jury Practice and Instructions, Vol. 2, § 54.04 at 895 (4th ed. 1992).

Yet another problem we perceive is the potential for confusion, or misapplication, or both, that may result from using this language. If these words are intended to suggest an individual may not be convicted of distributing drugs unless he has an improper motive, or, as suggested by defense counsel before the district court, a "bad purpose," this is simply incorrect. Motive, unlike *mens rea,* is not an essential element of a criminal offense. It is an explanation that may tend to make a party's theory of the case seem more plausible or understandable; but the absence of any proof bearing on a defendant's motive may not support a motion for a judgment of acquittal, whereas insufficient evidence of

### B.

Although we disagree with the district court's reliance on the "concrete involvement" language to dismiss counts one and two, we agree with the district court's ultimate conclusion dismissing counts one and two. In our view, there was insufficient evidence of "distribution" presented to the trier of fact to support the convictions on counts one and two.

 The issue of whether there was sufficient evidence to support a finding of guilt was not raised below nor was it asserted in the briefs on appeal.[8] While this ordinarily constitutes a waiver of the issue, precluding us from reviewing the merits of the claim, our case law unquestionably recognizes our inherent power to raise an issue *sua sponte* as plain error under circumstances strongly implying a fundamental defect or error of sufficient magnitude to undermine our confidence that justice was served. *See, e.g.,* Fed.R.Crim.P. 52(b) & adv. comm. note (discussing, *inter alia, Wiborg v. United States,* 163 U.S. 632, 658, 16 S.Ct. 1127, 1137, 41 L.Ed. 289 (1896) ("And although this question was not properly raised, yet if a plain error was committed in a matter *so absolutely vital to defendants,* we feel ourselves at liberty to correct it.") (emphasis added)); *United States v. Brown,* 995 F.2d 1493, 1504 (10th Cir.) (noting "a critical omission is one which should be noted by an appellate court *sua sponte* as plain error."),

cert. denied, —— U.S. ——, 114 S.Ct. 353, 126 L.Ed.2d 317 (1993); *United States v. Kline,* 922 F.2d 610, 613 (10th Cir.1990); *United States v. Greschner,* 802 F.2d 373, 380 (10th Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987) (recognizing the power to raise plain error *sua sponte* ); *United States v. Zolicoffer,* 869 F.2d 771, 774 (3d Cir.) ("the failure to prove one of the essential elements of a crime is the type of fundamental error which may be noticed by an appellate court notwithstanding the defendant's failure to raise it in the district court") (citing *Strickland v. United States,* 339 F.2d 866, 868 (10th Cir.1965)), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3172, 104 L.Ed.2d 1034 (1989).

 In *Kline,* we stated courts of appeals do not search appellate records for unassigned errors, and claims not asserted on appeal are deemed waived except in the extraordinary case where necessary "to prevent a manifest miscarriage of justice." *Kline,* 922 F.2d at 613 (citing *United States v. Fagan,* 821 F.2d 1002, 1015 n. 9 (5th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988)). While we strongly adhere to the principle that only the exceptional case will warrant the exercise of this extraordinary power, we believe the prosecution's failure to prove an essential element of the crimes charged beyond a reasonable doubt in this case offends our most fundamental sense of due process. *See In re*

---

*mens rea* could support such a motion as it is an essential element of the offense. Thus, to the extent the "concrete involvement" language implies the necessity of proof of an improper motive, this language is being misapplied.

Finally, if the "concrete involvement" language is being used as a means of separating "true" criminal acts from other situations, such as an undercover police officer who transfers drugs to an unsuspecting buyer during the course of a sting operation, or the "Good Samaritan" private citizen who finds drugs on the street and takes them to the police station, we believe the "concrete involvement" language is an inappropriate vehicle. Section 841(a)(1) would, if read literally, criminalize the two situations described above. While that result may seem absurd, the conclusion that Congress in fact intended this result is bolstered by the enactment of statutes like 21 U.S.C. § 885, which confers an immunity to an individual like an undercover officer who handles controlled sub-

stances during the course of his official duties. If Congress did not intend to criminalize this type of conduct because there is no evidence of any "concrete involvement," then § 885 seems unnecessary. Moreover, while § 841(a)(1) might literally extend to an individual who finds drugs on the street and brings them to a police station, we believe adequate protection exists in the sound exercise of prosecutorial discretion, rather than requiring any type of nebulous "concrete involvement" in the criminal undertaking.

For all of the foregoing reasons, we believe this language to be an unwarranted and potentially misleading gloss lacking in any common law or statutory support. As such, we caution against its use in the future.

8. Due to the unusual procedural posture of this issue, we ordered the parties to file supplemental briefs limited to the issue of whether there was sufficient evidence to support the jury's findings of "distribution" as to counts one and two.

*Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). Accordingly, it is appropriate for us to exercise our power to raise the sufficiency of the evidence *sua sponte* as plain error.

As indicated above, Congress specifically defined the term "distribution" as "the actual, constructive, or attempted transfer of a controlled substance." 21 U.S.C. § 802(8). The government's position in both its opening and supplemental briefs is "that the defendant possessed cocaine in November, 1989 and in December, 1989, and *physically passed* the cocaine on to Mares." (Emphasis added.) In other words, the government asserts the distribution took the form of an actual transfer from Mr. Santistevan to Mr. Mares.[9]

The plain, ordinary meaning of the words "actual transfer" connotes the passing of an object from one person to another, *see* Webster's New International Dictionary, Unabridged 2427 (3d ed. 1981), although the government correctly notes that in order to satisfy the distribution element, it need not prove a sale. *See Wigley*, 627 F.2d at 226. We have carefully reviewed the briefs and the record on appeal in search of any evidence supporting a finding that Mr. Santistevan passed the drugs to Mr. Mares. The record simply belies such a finding. We find no evidence to support even a reasonable inference that Mr. Santistevan transferred cocaine to Mr. Mares as charged in counts one and two. When asked about this possible deficiency in proof at oral argument, the government directed us to two excerpts of testimony. The evidence we were referred to does not, either individually or collectively, support the government's position.

The first excerpt we are directed to is the testimony of Mr. Santistevan's girlfriend, Edith Bridgeforth. Her testimony, however, does not address the alleged distributions forming the basis for counts one and two, which occurred in November and December of 1989, respectively. Rather, her testimony pertains to the remaining counts in the indictment alleging "real" drug distributions between Mr. Santistevan and Mr. Mares, the first of which happened in January of 1990.

On direct examination, Ms. Bridgeforth admitted meeting Mr. Santistevan in the fall of 1989. She further acknowledged Mr. Santistevan began living with her at the end of November 1989. When she began testifying as to matters pertaining to the substantive counts alleged against Mr. Santistevan, she stated the first transaction she was describing occurred in January of 1990. Before she described other incidents between Mr. Santistevan and Mr. Mares, she stated the events took place in January and February of 1990. In sum, Ms. Bridgeforth's testimony is simply not relevant to counts one and two. Her testimony as to the defendant's actions in distributing drugs to Mr. Mares began in January of 1990 and would appear to relate to counts three through seven of the indictment, as opposed to counts one and two, which occurred at the end of 1989. Therefore, this evidence cannot, and does not, support the convictions on counts one and two.

The second excerpt relied on by the government is the testimony of Mr. Mares. Although a portion of his testimony does in fact relate to counts one and two, we believe it is insufficient as a matter of law to support a finding of distribution. The essence of Mr. Mares' testimony relative to counts one and two is he was asked by Mr. Santistevan to help him in a "fake buy." According to Mr. Mares, Mr. Santistevan asked him to pose as a buyer of drugs. Mr. Santistevan would provide the money and the drugs and Mr. Mares would make it appear as though he was buying the drugs from the defendant.

---

9. In its supplemental brief, the government seems to argue Mr. Santistevan was properly convicted of distributing controlled substances to Mr. Mares because Mr. Santistevan caused Mr. Medina to pass controlled substances to him so he could pass them on to someone else. This argument, however, misses the point. Even if Mr. Santistevan was distributing drugs on behalf of Mr. Medina, counts one and two of the indict-ment charged Mr. Santistevan with the acts of distribution in November and December of 1989. Therefore, in order to sustain a conviction under § 841(a)(1) against Mr. Santistevan, the government was required to prove, as an essential element of the crime, that Mr. Santistevan "distributed" the substances to Mr. Mares, an issue separate from, and independent of, Mr. Medina's actions *vis-a-vis* Mr. Santistevan.

The relevant portions of Mr. Mares' testimony was he met Mr. Santistevan at Ms. Bridgeforth's apartment in November of 1989; "he" (Mr. Santistevan) left the apartment and returned with a bundle of money; the two men counted the money; "he" again left the apartment and returned shortly thereafter with a kilo of cocaine; "he" opened the cocaine and took a piece; and "he" then took the cocaine and left the apartment. With respect to the second count, Mr. Mares testified the sequence of events was the same.

We are simply at a loss to see how this testimony supports a finding that Mr. Santistevan transferred the drugs to Mr. Mares. The entire testimony is Mr. Santistevan did everything himself. While the government's position at oral argument was that the evidence of transfer was circumstantial, we believe the inference sought to be drawn crosses the admittedly imprecise line between a "reasonable" inference based on the evidence and impermissible speculation and conjecture. *See, e.g., United States v. Galbraith,* 20 F.3d 1054, 1057 (10th Cir.) (citing *Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 521 (10th Cir.1987) (citing *Galloway v. United States,* 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943))), *cert. denied,* —— U.S. ——, 115 S.Ct. 233, 130 L.Ed.2d 157 (1994). It is worth reiterating that in reviewing the sufficiency of the evidence, we do not give the government the benefit of *every potential* inference but rather, only those inferences reasonably and logically flowing from the other evidence adduced at trial. *E.g., Coleman,* 9 F.3d at 1482. Therefore, we find Mr. Mares' testimony insufficient to sustain the verdicts on counts one and two.[10]

### CONCLUSION

We **AFFIRM** the district court's denial of Mr. Santistevan's request for a base offense level reduction pursuant to § 3B1.2, and we **AFFIRM** the district court's order granting Mr. Santistevan's motion for judgment of

10. While the government proceeded on the theory of an actual transfer, we do not believe the evidence supports a finding of either an attempted transfer or a constructive transfer. As indicated above, the only evidence is that Mr. Santis-

acquittal as to counts one and two based on insufficient evidence of the essential element of distribution.

tevan did everything himself. This alone is insufficient to constitute a delivery under any definition of that term, and therefore, the convictions are still infirm.